IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ELIZABETH DELARAMA,                    )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )        No.  05 C 5163
                                       )
ILLINOIS DEPARTMENT OF HUMAN           )
SERVICES, et al.,                      )
                                       )
                    Defendants.        )

MEMORANDUM OPINION AND ORDER

Elizabeth de la Rama ("de la Rama")[1] originally filed a

five-count Complaint against her employer, the Illinois

Department of Human Services ("Department"), and her former

supervisor Mary Zukowski ("Zukowski") individually, charging that

she was discriminated against on the basis of her race and

national origin under Title VII of the Civil Rights Act of

1964,("Title VII," 42 U.S.C. §§2000e to 2000e-17), as well as

having been denied rights arising under the Americans With

Disabilities Act ("ADA," 42 U.S.C. §§12101-12117) and the Family

Medical Leave Act ("FMLA," 29 U.S.C. §§2601-2654.  In addition to

those federally based claims, Delarama complains that Zukowski

made false and malicious statements about her, statements that

gave rise to a common law claim of defamation.

_____

        [1] Although both sides' counsel's submissions are
inconsistent in their references to plaintiff (most often using
the one-word "Delarama" spelling), this opinion conforms to de la
Rama's signature on various of the submitted documents--after
all, who knows best?

At the close of discovery Department moved for summary judgment pursuant to Fed. R. Civ. P. ("Rule") 56, and de la Rama has responded to its motion. For the reasons set forth in this memorandum opinion and order, Department's motion is granted in its entirety and this action is dismissed.

<u>Summary Judgment Standard</u>

Well-established Rule 56 principles impose on Department the burden of establishing a lack of a genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must consider the evidentiary record in the light most favorable to nonmovant de la Rama and draw all reasonable inferences in her favor (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment, de la Rama must produce "more than a mere scintilla of evidence to support her position" that a genuine issue of material fact exists (<u>Pugh v. City of Attica</u>, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (<u>id</u>.). If the record reveals that no reasonable jury could find in favor of de la Rama, summary judgment must be granted (see <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

To enable this Court to evaluate that possibility, what follows is a summary of the facts, viewed in nonmovant de la Rama's favor under the criteria prescribed by Rule 56 and this

District Court's LR 56.1.[2]  And that of course obviates any need to repeat "according to de la Rama" or the like, or to identify any conflicting account, though the latter is sometimes included for purely informational purposes.

## Background

De la Rama is an American of Filipino descent who has been employed as a registered nurse at Chicago-Read since 1991 (C. St. ¶3) to provide nursing care and treatment to mentally ill adults (id.).  From January 2004 through January 2005 Zukowski was de la Rama's supervisor.  As part of de la Rama's benefits package she was entitled to paid time off of work for sick leave, vacation, holidays, overtime and personal days (id. ¶8).  In terms of her sick time de la Rama was provided with 12 sick days per year, accrued at the rate of one sick day per month (id. ¶4).

From July 19 through August 19, 2004 de la Rama began to take days off of work for a condition that would much later be

---

[2]  LR 56.1 implements Rule 56 by requiring each party to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which are not.  Because de la Rama worked as a registered nurse at Department's Chicago-Read Mental Health Center ("Chicago-Read"), and because it would be bizarre indeed to use "D." to connote both Department's submissions and those tendered by de la Rama, this opinion cites to Department's statement as "C. St. ¶--" and to de la Rama's response as "D. St. ¶ --."  Where an assertion in Department's statement is undisputed by de la Rama, the opinion includes only a citation to the original statement.  "C." and "D." designations are also used in referring to all other documents submitted by the parties.  Finally, citations to de la Rama's deposition will take the form "D. Dep."

diagnosed and disclosed as fibromyalgia (D. St. ¶30). On July 21 de la Rama called in sick for her shift, but she then came to Chicago-Read in the afternoon during a colleague's retirement party and attempted to give Zukowski a doctor's note explaining her illness (C. St. ¶32). Zukowski told de la Rama that a retirement party was not the appropriate venue to talk about her sick leave and suggested that they discuss the matter later (id. ¶33). When de la Rama was unable to locate Zukowski after the party, she opted to leave the doctor's note--a note that merely stated de la Rama was under a doctor's care for back pain and was "not able to continue working for 1 week till she recovers from her back pain" (id.)--with a co-worker (id. ¶38). As de la Rama was leaving the building that day, she stopped by the personnel office to obtain Chicago-Read's "CMS 95 form," which would enable her to take medical leave once it had been completed by her doctor (id. ¶36).

At that point de la Rama was aware that she had already exhausted her sick leave, yet she continued to call in sick without explaining the nature of her illness (C. St. ¶31). On July 27 she delivered another doctor's note to Chicago Read's evening nurse coordinator Angie Sanchez ("Sanchez")(id. ¶41). Again that note lacked both a date and a diagnosis, but it said that de la Rama would be unable to work until August 10, 2004 (id. ¶41). On the next day de la Rama spoke with Human Resource

Specialist Nancy Heneghan ("Heneghan"), who told de la Rama that she needed to request a leave of absence in writing and submit it along with the CMS 95 form that she had received on July 21 (id. ¶42). But de la Rama did not then proceed to submit the requisite forms, and she had no further contact with Chicago-Read until August 19, when Associate Director of Nursing Alice Schultz ("Schultz") called her to arrange a meeting about her leave of absence (id. ¶¶43, 46, 44). After that conversation de la Rama produced three more doctors' notes on August 20, none of which provided a diagnosis of her condition (id. ¶45).

During that time Zukowski marked de la Rama's absences as unauthorized because she had exhausted all her accrued sick time and had never communicated with a supervisor about substituting other benefit time in place of sick time, as required under the Chicago-Read personnel manual (C. St. ¶¶12, 40, 43). De la Rama was aware that Zukowski also directed other personnel to consider de la Rama's absences as unauthorized leave while de la Rama continued to call in sick (id. ¶48).

On October 4 de la Rama finally returned a completed CMS 95 form to Heneghan and Schultz, who in turn retroactively activated de la Rama's leave to the date of her last sick day, September 2 (C. St. ¶¶51, 52). De la Rama also obtained a "Request for Accommodation Form" from Carl Smith ("Smith"), the former director of labor relations at Chicago-Read, but she never

completed it because she said she was not seeking an accommodation under ADA (id. ¶¶69-70).  Ultimately de la Rama took a partially retrospective five-month unpaid leave that called for her to return to work on January 3, 2005, when at her union's request she was assigned to a different unit under a new supervisor, Marissa Marcelli ("Marcelli")(id. ¶52).

After de la Rama returned to work in 2005, she, her union representative and Marcelli attended a pre-disciplinary meeting regarding her 24 absences that had been treated as unauthorized (C. St. ¶55).  At the meeting it was decided that de la Rama would not be disciplined for the unauthorized absences, although any future unauthorized absences would trigger disciplinary procedure against her (id. ¶55).  De la Rama, unhappy with that outcome, pursued a grievance that sought to get the 24 unauthorized absences off her record entirely (id. ¶57).  At the third-level grievance hearing, where de la Rama was represented by three union officials, management and the union agreed that the 24 unauthorized absences would remain on de la Rama's employment record, but that the absences would never be used in any disciplinary determinations against de la Rama (id. ¶60).

Still unsatisfied, de la Rama filed this action to complain that Zukowski (and hence Department) had discriminated against her because of her race and national origin and that Zukowski individually had slandered her on two separate occasions--once

during the time period in which Zukowski told co-workers to mark de la Rama's absences as unauthorized and then later during the third-level grievance hearing. As stated at the outset, de la Rama also complains that Department violated both the FMLA and the ADA.

## Employment Discrimination Claims

As is well known (really too well known to require repetition, even though just about every opinion in this area of the law continues to do so), there are two methods by which a plaintiff may prevail in an employment discrimination action--the direct and indirect methods of proving[3] that her employer took an adverse employment action against her because of her race or national origin. Under the direct method, de la Rama could succeed in doing so through an admission by Department or through circumstantial evidence of discrimination (see Raymond v. Ameritech Corp., 442 F.3d 600, 610 (7th Cir. 2006)). Alternatively, she may proceed under the burden-shifting method memorialized in the seminal decision in McDonnell Douglas Corp.

---

[3] In the summary judgment context, of course, de la Rama's burden is only one of demonstrating the existence of genuine issues of material fact, not one of proof as such (see Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1124 (7th Cir. 1994)). But any continued repetition of that burden involves an awkward locution, an awkwardness contributed to by the fact that so much of the caselaw speaks of what a party responding to a Rule 56 motion must "establish" or "prove" or "show." Whenever this opinion employs such terms, it should therefore be understood as denoting only de la Rama's lesser burden described in this footnote, not the actual burden of persuasion.

<u>v. Green</u>, 411 U.S. 792 (1973).

Under that indirect method de la Rama's prima facie case comprises four elements, identified this way in <u>Raymond</u>, 442 F.3d at 610:

> (1) she is a member of a protected class; (2) she was performing at a level that met her employer's legitimate expectations; (3) she was subject to an adverse employment action; and (4) she was treated differently than a similarly situated person outside her protected classes.

Once de la Rama establishes her prima facie case, the burden shifts to Department to "articulate some legitimate, non-discriminatory reason" for the adverse employment action (<u>id</u>., quoting <u>McDonnell Douglas</u>, 411 U.S. at 802). If Department does so, de la Rama must then show that the proffered reason is pretextual. Although the burden of production thus shifts back and forth in that manner, de la Rama as plaintiff always bears the burden of persuasion (<u>id</u>.).

In this instance any parsing in terms of those alternatives is really academic, because the essential predicate for any claim of discrimination is an adverse employment action--and de la Rama simply has not reached that first step of showing that she suffered an adverse employment action due to her race or national origin (or, indeed, for any other reason). On that score <u>Rhodes v. Ill. Dep't of Transp.</u>, 359 F.3d 498, 504 (7th Cir. 2004), quoting <u>Crady v. Liberty Nat'l Bank & Trust Co.</u>, 993 F.2d 133, 136 (7th Cir. 1993) has emphasized that "[a] materially adverse

employment action is something 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Rhodes, 359 F.3d at 504 then went on to describe the burden a plaintiff must bear successfully to demonstrate an adverse employment action:

> For purposes of Title VII, an adverse employment action is a significant change in the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits.

It is undisputed that de la Rama called in sick 24 times between July 19 and August 19 and that she had already exhausted all of her sick time. In spite of that, she was granted her federally protected five-month leave of absence upon complying with the administrative requirements. Upon her return she was given a new supervisor at her union's request. No financial consequences were visited on her--her pay was unaffected. And finally, at her pre-disciplinary hearing the union and management agreed that none of the unauthorized absences would ever be used against her in any future disciplinary actions.[4]

---

[4] Here is de la Rama's own testimony as to how Chicago-Read typically handles unauthorized absences (D. St. ¶137, citing D. Dep. 195-96):

> Chicago Read policy allowed only 10 or 11 UA's before a person is terminated.

In those terms de la Rama was actually treated more favorably, for termination was never even posited as a possible sanction for the 24 unauthorized absences.

With no showing having been made that de la Rama suffered any adverse employment action, her claims of national-origin and racial discrimination cannot proceed. Department's motion is therefore granted as to de la Rama's employment discrimination claims.

## ADA Claim

Under ADA an employer is precluded from discriminating "against a qualified individual with a disability because of the disability of such individual" (42 U.S.C. §12112(a)). In addition to prohibiting such discrimination, ADA also requires employers to make reasonable accommodations for the disabilities of qualified individuals (see 42 U.S.C. §12112(b)(5)(A)). Though de la Rama's argument is difficult to follow, it appears that she complains that Department failed to accommodate her fibromyalgia, in violation of ADA, when it charged her with the 24 unauthorized absences during July and August 2004.

EEOC v. Sears, Roebuck & Co. ["Sears, Roebuck"], 417 F.3d 789, 797 (7th Cir. 2005) defines de la Rama's task in that respect:

> To establish a claim for failure to accommodate, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to accommodate the disability.

Importantly, as to the third element "ADA requires that employer and employee engage in an interactive process to determine a

10

reasonable accommodation" (Baert v. Euclid Beverage, Ltd., 149
F.3d 626, 633 (7th Cir. 1998)).  As such, "[i]f a disabled
employee shows that her disability was not reasonably
accommodated, the employer will be liable only if it bears the
responsibility for the breakdown of the interactive process"
(Sears, Roebuck, 417 F.3d at 797).

De la Rama must first demonstrate that she was a qualified
individual under ADA by showing that despite her disability she
could perform the essential functions of her job either with or
without reasonable accommodation (see 42 U.S.C. §12111(8)).
Because de la Rama claims her disability arose from fibromyalgia,
to bring that claim within the ADA's ambit she must show that
fibromyalgia is an impairment that "substantially limits one or
more of her major life activities" (42 U.S.C. §12102(2)(A)).  In
that regard she asserts that her fibromyalgia prevented her from
performing the major life function of working, as to which
Cassimy v. Bd. of Ed. of Rockford Pub. Sch., 461 F.3d 932, 936
(7th Cir. 2006) teaches:

> To the extent that "working" is the major life activity
> under consideration, [de la Rama] must show that [she]
> had an inability to work in "a broad range of jobs,
> rather than a specific job."

De la Rama's deposition testimony regarding her limitations
is internally inconsistent.  On the one hand she claims that
fibromyalgia debilitated her to the point where she could not get

out of bed up to three days per month (D. Dep. 149).[5]  On the
other hand she admits that throughout her disability period she
maintained the ability to bathe herself, grocery shop, drive,
walk and do laundry (D. Dep. 148-49), all of which suggest that
working would also have been possible, even if she could not have
performed her specific job.  According to the record, de la
Rama's job was a "heavy duty lifting position" requiring her "to
lift 50 pounds; ambulate arms...walking, stooping, bending and
lifting" as well as assisting "other units in management of
aggressive patients" (D. Dep. 6, 9, 11; Ex. 1), but there is no
evidence that there was no other suitable position at Chicago-
Read that de la Rama could perform in spite of her disability.
Thus de la Rama has failed to show how her disability would have
precluded her from the "broad range of jobs" required by Cassimy,
461 F.3d at 936.

    But this opinion need not rest on that problematic aspect of
de la Rama's claim.  Even if she were to be viewed as having
shown that her ability to work was substantially limited, she
must also demonstrate that Department was aware of her
disability.  It goes without saying that an employer cannot
accommodate an employee with a disability until the disability is

_____

    [5]  Even on that score it may be remembered that as
debilitating as three days of incapacitation may have been, that
does not address why she needed a full 24 days during the summer
of 2004.

disclosed.  Only after a plaintiff requests an accommodation for
her asserted disability is awareness of its existence imputed to
the employer, so that there is no ADA liability until the
employee requests an accommodation.  That principle has been
explained in these terms by <u>Jovanovic v. In-Sink-Erator Div. of
Emerson Elec. Co.</u>, 201 F.3d 894, 899 (7th Cir. 2000), quoting
<u>Beck v. Univ. of Wis. Bd. Of Regents</u>, 75 F.3d 1120, 11234 (7th
Cir. 1996):

> An employee has the initial duty to inform the employer
> of a disability before ADA liability may be triggered
> for failure to accommodate--a duty dictated by common
> sense lest a disabled employee keep his disability a
> secret and sue later for failure to accommodate.

De la Rama was first diagnosed with fibromyalgia on
August 9, 2004 (she had begun calling in sick nearly three weeks
earlier--on July 19--without informing her supervisors about her
diagnosis or condition).  Even then de la Rama still did not
communicate with Chicago-Read about her diagnosis or her
accommodation needs.  Instead it was actually Chicago-Read's
Schultz that initiated contact with her on August 19 to discuss
her absences.  Ultimately de la Rama did not produce medical
documentation indicating she was suffering from fibromyalgia
until October 4, nearly two months after her diagnosis and after
she had already incurred the 24 unauthorized absences.

That undisputed timeline negates any contention that
Chicago-Read knew about de la Rama's fibromyalgia when it marked

her 24 absences as unauthorized. Instead all that was known was that de la Rama continued to call in sick--despite having used all of her accrued sick time--and to submit undated doctors' notes that failed utterly to indicate her condition or treatment plan, much less any accommodation that might be necessary.

This Court also observes that de la Rama has testified that she did not have her doctor fill out ADA accommodation forms because she was "not applying for accommodation" (D. Dep. 186). Nor is there any record evidence that de la Rama ever submitted any request for accommodation, either orally or in writing. Hence Department's motion is also granted as to de la Rama's ADA claim.

## FMLA Claim

Under FMLA "any eligible employee suffering from a serious health condition that renders [her] unable to perform the functions of [her] position [is entitled] to twelve workweeks of leave during each twelve-month period" (Burnett v. LFW Inc., No. 06-1013, 2006 WL 3771796, at *3 (7th Cir. Dec. 26)). Plaintiffs claiming FMLA violations may proceed under theories that employers either interfered with their rights or retaliated against them for exercising FMLA rights (id.). de la Rama claims that Department interfered with the exercise of her FMLA rights in violation of 29 U.S.C. §2615(a)(1):

> It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt

14

to exercise, any right provided under this subchapter.

<u>Burnett</u> at *4[6] prescribes the burden de la Rama has to meet:

Accordingly, the employee must establish that:

(1) [she] was eligible for the FMLA's protections, (2) [her] employer was covered by the FMLA, (3) [she] was entitled to leave under the FMLA, (4) [she] provided sufficient notice of [her] intent to take leave, and (5) [her] employer denied [her] FMLA benefits to which [she] was entitled.

Department admits the first and second of those elements and its memorandum is silent as to the third. Instead it urges that de la Rama failed to provide sufficient notice and that she cannot show that she was denied any FMLA benefits.

It is true that "[t]he notice requirements of the FMLA are not onerous" (<u>Burnett</u> at *5), but an employee must at a minimum provide information "sufficient to show that [she] <u>likely</u> has an FMLA-qualifying condition" (<u>id</u>.). While adequacy of notice is a fact-specific inquiry, "an employee's bare assertion that [she] is 'sick' is insufficient" (<u>id</u>.).

From July 19 to August 19 de la Rama called in sick every single day that she was scheduled to work without ever mentioning any specific diagnosis or indicating that her condition would require an extended period of sick leave. Although she submitted several doctors' notes, not one elucidated the circumstances of her absences or indicated the severity of her condition. In fact

---

[6] Further citations to <u>Burnett</u> will simply cite the * page number, omitting the WL citation.

the note from Dr. Sychangco dated July 20 simply stated that de la Rama was under his care for back pain, but she would be able to return to work within one week (see D. Dep. Ex. 6). Similarly, the July 27 note from Dr. Orbeta cryptically noted that de la Rama was under his care and "needs to be off work till August 10/04" (see id.). From those scant descriptions it is not reasonable to infer that Chicago-Read could divine de la Rama's eligibility for FMLA leave because of a "serious health condition that [made] [her] unable to perform the functions of" her position (29 U.S.C. §2612(a)(1)(D)).

Notably, de la Rama continued to submit generalized doctors' notes about her muscle, neck and lower back pain (see D. Dep. Ex. 6), none of which indicated a diagnosis. When she finally did provide adequate documentation about her diagnosis of fibromyalgia on October 4, Department retroactively granted her an extended leave of absence going back to her last day of paid sick leave, which she had accrued on September 2. Ultimately Department granted de la Rama fully 17 weeks of sick leave, exceeding the federal mandate by five weeks.[7]

_____

[7] This case does not come within the exception marked out in Byrne v. Avon Prods., Inc., 328 F.3d 379, 381-82 (7th Cir. 2003), and again discussed and distinguished just ten days ago in Burnett v. LFW Inc., No. 06-1013, 2006 WL 3771796, at *5-*6, "when circumstances provide the employer with sufficient notice of the need for medical leave." Instead it was de la Rama's own failure to provide notice, when she had every opportunity to do so, that deprives her of any benefit from the Byrne exception. Again, once she provided a medical diagnosis Department allowed

16

Under those circumstances it cannot fairly be said that Department interfered with de la Rama's rights--and unfortunately her own memorandum is singularly unhelpful in that regard. Again it is undisputed that de la Rama was given leave time in excess of the statute as soon as she communicated that she was suffering from the debilitating effects of fibromyalgia. And again the 24 unexcused absences are no more than bogeymen: They never have been and never will be used against her.

In sum, de la Rama has failed to produce any evidence that creates an issue of material fact as to whether Department interfered with her FMLA rights. That claim also fails, and Department's motion is granted in that respect as well.

Defamation

Finally de la Rama contends that Zukowski defamed her on two separate occasions. <u>Suhadolnik v. Springfield</u>, 184 Ill.App.3d 155, 185, 540 N.E.2d 895, 913 (4th Dist. 1989) provides a succinct definition for purposes of that claim:

> Defamation is the publication of disreputable untruths about another person to a person other than the defamed.

Under Illinois law "[a] statement is defamatory if it tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with her" (<u>Quinn v. Jewel Food Stores, Inc.</u>, 276

---

her even more time than required by the FMLA.

Ill.App.3d 861, 865, 658 N.E.2d 1225, 1229 (1ˢᵗ Dist. 1995)).
And defamation comes in two flavors:  defamation per se and
defamation per quod.

As to the former, <u>Quinn</u>, <u>id</u>. at 868, 658 N.E.2d at 1231
(citation omitted) articulates the operative principles:

> Statements are considered defamation <u>per se</u> when the
> defamatory character of the statement so obviously
> injures the plaintiff's good name or reputation that
> the plaintiff need not prove injury or damages.  There
> are four recognized categories of statements that are
> considered defamatory <u>per se</u>:  (1) words which impute
> the commission of a criminal offense; (2) words that
> impute infection with a loathsome communicable disease;
> (3) words that impute an inability to perform or want
> of integrity in the discharge of duties of office or
> employment; or (4) words that prejudice a party, or
> impute lack of ability, in her or her trade, profession
> or business.

As for the second category, plaintiffs may prove that statements
can amount to defamation per quod where "extrinsic facts are
required to explain their defamatory meaning" (<u>Quinn</u>, <u>id</u>. at 870,
658 N.E.2d at 1232).  In other words, on its face a defamatory
per quod statement looks innocent, but extrinsic facts show (or
imply) otherwise.  And to succeed at proving defamation per quod,
plaintiffs must allege special damages beyond those general
losses to health, reputation or general economic loss (<u>id</u>., 658
N.E.2d at 1233).  But "[w]here the extrinsic facts are
insufficient to reasonably support the defamatory meaning
plaintiff urges, dismissal of the complaint is in order" (<u>id</u>.,
658 N.E.2d at 1232).

In this instance de la Rama proceeds under a theory that Zukowski's statements amounted to defamation per se. To that end she first contends that Zukowski defamed her orally--a claim of slander--during July and August 2004, the time period when she was absent from work but before she had complied with the required procedures for taking extended leave. De la Rama learned that Zukowski made statements about her unauthorized absences when her co-workers reported them to her during that same time period.

Under Illinois law "[a]ctions for slander, libel or for publication of matter violating the right of privacy, shall be commenced within one year next after the cause of action accrued" (735 ILCS 5/13-201). And for that purpose <u>Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.</u>, 61 Ill.2d 129, 131-32, 334 N.E.2d 160, 161 (1975) teaches:

> It has been generally held that in defamation cases the cause of action accrues and the statute of limitations begins to run on the date of publication of the defamatory material.

Because de la Rama filed her Complaint on September 9, 2005, Department correctly asserts that the first-charged conduct was outside the limitations period--and de la Rama's memorandum fails to address that argument. Clearly Zukowski's challenged statements dating back to July and August 2004 are time-barred.

That leaves de la Rama's second contention, which is timely advanced--an assertion that during the third-level grievance

19

hearing Zukowski slandered her by telling "false stories" (D. Dep. 236) about how de la Rama "didn't communicate with her" (id.) and how her doctors' notes were somehow deficient (id.). De la Rama complains that Zukowski's words were tantamount to accusing her of failing "to perform her employment in violation of her integrity and her skills at performing as a professional" (FAC ¶44), thus bringing into play the third and fourth categories of defamation per se statements.

Sure enough, in the course of explaining why she marked de la Rama's absences as unauthorized, Zukowski said that the doctor's notes initially proffered by de la Rama did not provide sufficient information to excuse the absences. But those statements (quite apart from their being true, which by definition is always fatal to a defamation claim) related only to de la Rama's failure to follow hospital procedures for obtaining a leave of absence, not to her ability to fulfill her duties as a nurse.

In a similar context Powers v. Delnor Hosp., 148 Ill.App.3d 844, 847, 499 N.E.2d 666, 668 (2d Dist. 1989) rejected a nurse's defamation claim because the comments supervisors wrote in her personnel file were not actionable per se because they were "directed to plaintiff's relationship with her co-workers and [did] not pertain to her knowledge and ability to care for patients as a nurse." By the same token, because Zukowski's

second set of challenged statements concerned only de la Rama's failure to navigate through the proper procedures and paperwork that would entitle her to extended time off from her employment duties, they do not fall into any of the categories of defamation per se.

Thus de la Rama's state law claims of defamation both fail, albeit on different grounds. Department's Rule 56 motion is granted as to those claims too.

## Conclusion

None of de la Rama's claims is supported by evidence that creates a genuine issue of material fact, so that Department is entitled to a judgment as a matter of law. Its motion for summary judgment is granted in its entirety, and this action is dismissed.

_____
Milton I. Shadur
Senior United States District Judge

Date: January 5, 2007